Filed 8/6/13  P. v. Samos CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | B239703 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA082655) |
| v. | |
| ANGEL SAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Arthur H. Jean, Jr., Judge.  Affirmed.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Angel Samos (Samos) embarked on a two-day crime spree that included a kidnapping for carjacking, assaults on police, and attempted murder. His one-man crime wave ended when a policeman shot him in the head. Trial was by jury. On appeal, Samos challenges his conviction on the kidnapping for carjacking charge. We affirm.

## FACTS

### *Tasha R.*

On July 4, 2009, Tasha R. was driving her daughter (age 11) and niece (age 6) to watch fireworks. Tasha has two young sons with defendant Samos. After Tasha ended their relationship, Samos was supposed to stay away from her.

While stopped at an intersection, Tasha was suddenly attacked by Samos, who opened the door and hit her hard, knocking her over. Samos got into the driver's seat and drove Tasha and the two girls to the back of a nearby appliance store, which was closed for the holiday. The owner of the store allowed Samos to work and sleep at the building.

Samos took Tasha into the appliance store, locked the door, and restrained her ankles and hands with duct tape and shoelaces. He struck her in the face repeatedly with a gun. Though vague on the details of her four-hour ordeal, Tasha testified that Samos sexually assaulted her while her daughter and niece sat in the car. She could hear the girls crying and honking the car horn outside the building.

Tasha was afraid. To end the situation, she told Samos that they would restart their relationship. In truth, she had no intention of going back to him, but hoped to convince him to let her go. The ruse worked. Samos removed the duct tape and returned to the car with Tasha.

Samos drove to an Arco station with Tasha and the two children. He told Tasha to put gas in the car. Instead, she testified, "I got out and I ran," after unsuccessfully attempting to open the car's back door to remove the girls. After entering a liquor store, she heard gunshots.

When police arrived, they found Tasha shaking and crying, her left eye closed and bruised, and her lip injured. She received treatment at a violence intervention clinic, complaining of tenderness and pain on the back of her head, which was swollen; bruises

2

on her right shoulder, upper back and right arm; and abrasions on her elbow. Markings on her wrist were consistent with being restrained with duct tape. The clinic noted that Tasha's left eye and face were bruised, and her lip was cut and swollen. A sexual assault exam was performed, but no injuries were found. Police searched the appliance store, where they found Tasha's purse, hat, and used duct tape with shoestrings attached to it.

### *Sonia Tejada*

While Tasha R.'s car was stopped at the Arco station, a Hyundai pulled up to purchase gasoline. Inside were the driver Sonia Tejada (Tejada), her brother, her six-year-old son, her five-year-old niece, and her mother. Tejada opened the gas cap while her brother went to pay the cashier. Tejada saw a woman pass by, crying. Tejada told her mother "something is going on here" and honked the horn to get her brother's attention so that they could leave. Just then, Tejada saw a man knocking on the passenger window and motioning her to open the door. She said "no," turned on the car and started to reverse quickly. The man tried to open the car door.[1] Tejada's mother confirmed that they were trying to escape because the man grabbed the passenger door.

The man holding onto the passenger door fell to the ground as Tejada rolled backward. Tejada's mother, son and niece were still in the back seat. Tejada was so panicked and frightened for their safety that she struck another car when she backed up. As Tejada drove onto the street, she heard several gunshots. Four bullets hit the Hyundai, and Tejada was struck by a bullet in her lower back. Her mother saw the man shooting at them, grabbed the children and ducked down.

Tejada told her mother, "He hit me. He shot me," but kept driving though she felt short of breath. After half a block, she saw a church. She parked and ran up screaming "Help me. I got shot." Nobody helped her: they stared or ran away. She hid in a restroom. An eyewitness at the church recalled that a woman who was "full of blood"

---

[1]     These events were captured on a security camera at 9:53 p.m. on July 4, 2009. In the video stills, Samos can be seen holding a gun in his right hand.

3

came up crying, "Help me, help me."  The bloodied woman entered the restroom and locked it.  At that moment, a man walked up carrying a gun, kicked open the restroom door and went inside.  As the woman in the restroom yelled for help, the man with the gun in his hand grabbed her and dragged her all the way out to the parking lot.  He was yelling bad words and saying "I am going to kill you" to the victim.

The eyewitness encountered the victim's mother in the parking lot, asking for someone to help her daughter.  The eyewitness got into her car and departed because "I didn't want to see anything else."  The eyewitness identified Samos as the man with the gun (in photo number 3) during a photo show-up on July 8, 2009, but was unable to recognize him in the courtroom during trial.

Tejada's mother stated that the man from the gas station approached the car at the church and demanded to know where Tejada was.  She replied that she did not know and she had two children there.  She identified the man as defendant Samos.  One of the children in Tejada's car later recognized Samos's photograph in the newspaper.

Tejada testified that the gunman from the Arco station found her hiding in the church restroom.  She covered her face and cried, thinking he was going to kill her.  She told an investigator on July 5 that the man pointed a gun at her and pulled the trigger but nothing happened.[2]  He grabbed her and pulled her, screaming "where did she go." Tejada had no idea what he was talking about, but pointed at a gate saying "She went that way" hoping that he would let her go.

As Samos tried to force her into his car, Tejada decided that "I would rather die than go with him."  She pulled away and started running, throwing herself into a truck that was leaving the church, saying "Help me.  He is trying to kill me."  The people in the truck replied that they did not want any problems:  they drove her half a block and told her to get out.  She ran to a nearby house where someone called 911.  At that point, her eyes were closing and she could go no further.  Paramedics took her to a hospital where

---

[2]     At trial, Tejada could not recall whether defendant was holding a gun or that it clicked as he pointed it at her.

she stayed for five days, undergoing surgery to remove the bullet. She is scarred and has organ damage and pain from the shooting.

At the preliminary hearing, Tejada identified Samos as the person who tried to enter her car. At trial, Tejada was unable to identify Samos, noting that the perpetrator was "skinnier" and had a different hairstyle. She was shown a photographic lineup in which she identified Samos (in photo number 3) as her assailant, writing on the page that she recognized him right away and would never forget his face because "he hurted [*sic*] me for the rest of my life. He almost killed me and my family."

<u>Child Abduction</u>

On July 4, Samos had left his two sons by Tasha, ages one and five, with his mother. Late that night, Samos called his mother and directed her to bring him the two boys, though they were asleep. She drove to meet Samos near a liquor store. Samos opened the sliding door of his mother's van, then came to speak to her. When his mother opened the sliding door to say goodbye to her grandsons, she saw other children in the van: she recognized Tasha's daughter and saw a small child as well. She does not know where the children came from. She told Samos to deliver the children quickly to Tasha and allowed him to take her van. Instead of returning the children to Tasha, Samos drove them to the home of a friend in Long Beach.

<u>Police Shootout</u>

On the morning of July 5, the police began undercover surveillance in Long Beach and located Samos and the four children. When they contacted him, he threatened to kill the children and himself. A SWAT team arrived to prevent Samos from driving off with the children.

As the SWAT team approached, Samos ran up the street. LAPD Officers James Toma and Michael Montoya were part of an undercover surveillance group tracking Samos. As Samos sprinted by, the officers saw him holding a stainless steel semiautomatic pistol. Montoya yelled "Stop, police" at Samos several times from 10 to 12 feet away. After running a little further, Samos stopped. As he turned toward the

officers, he brought the gun up in his right hand. Montoya could hear and see Samos chamber a round, holding the weapon at a 45 degree angle.

Officer Montoya fired at Samos, who simultaneously fired his weapon. Samos fell to the ground, struck in the head by a bullet. Despite his head wound, Samos startled the officers by raising himself up and dragging himself toward his gun, saying, "Who shot me?" When examined at the scene, Samos's gun was cocked, the safety was off, and a round was chambered. The magazine held both hollow-point and jacketed bullets. One of his bullets was found lodged in a nearby building.

<em>Defense Case</em>

Samos testified on his own behalf. After admitting numerous felony convictions (car thefts; receiving stolen property; evading police) and six prison stints, Samos effectively denied the charges. He explained that he took LSD at noon on July 4. Later, Tasha came to meet him at the appliance store, with the two children. While the children waited outside, Samos and Tasha entered the store for a consensual sexual encounter. After having sex, Samos looked at Tasha's cell phone and saw a picture of another man. He went into a rage, restrained Tasha with duct tape and shoelaces, and hit her hard. He felt hurt by Tasha's betrayal.

After the beating, his story continues, Tasha asked him to drive her and the kids because she cannot drive at night. At the Arco station, she took money from Samos for gas, but did not return. Because he was still under the influence of LSD, Samos mistook the driver of another car, Ms. Tejada, to be a friend of Tasha's.[3] As he opened Tejada's passenger door to ask where Tasha was, Tejada backed up and dragged him. He thought she would run him over, so he fired three or four bullets at her car in self-defense. Samos admitted that as a convicted felon, he is not allowed to possess a gun (or a stolen gun, in this case).

---

[3]     A physician testified that LSD may or may not affect memory or perception, or induce paranoia. Everyone reacts differently to the drug.

Still holding the gun, Samos re-entered Tasha's car and drove down the street. He saw Tejada getting out of her car at a church and "I went after her." He followed her into the church, asking where Tasha was. He denied pursuing Tejada into a restroom or threatening to kill her. He denied seeing blood on Tejada.

After his encounter with Tejada, Samos got into Tasha's car and went to pick up his sons. He instructed his mother to bring the boys to a location one block from her house in Long Beach. It was around midnight and he still had Tasha's daughter and niece in the car. Samos told the jury that he intended to spend time with his sons before committing suicide; however, in a telephone call to Tasha's mother, he signaled his intent to flee to Mexico.

Samos spent the night at a friend's house. The next day, he saw a SWAT team arrive. Samos left the children and ran. When he heard officers tell him to "freeze," he shot himself in the head, although his bullet was found in the ceiling of a parking structure.

## PROCEDURAL HISTORY

Samos was charged with: carjacking; kidnapping for carjacking; sexual penetration by foreign object; forcible oral copulation; attempted murder of Sonia Tejada; attempted murder of Officer Montoya; assault with a semiautomatic weapon on Officer Montoya; attempted murder of Officer Toma; assault with a semiautomatic weapon on Officer Toma; possession of a firearm by a felon; and shooting at an occupied vehicle. The information alleged that Samos used a firearm in the commission of his crimes. Samos pleaded not guilty and denied the special allegations.

As trial began, Samos pleaded no contest to the charge of being a felon in possession of a firearm. A jury convicted Samos of kidnapping for carjacking; attempted murder of Sonia Tejada; two counts of assault on a peace officer with a semiautomatic weapon; and shooting at an occupied vehicle. It found true the gun allegations. Samos was found not guilty of forcible oral copulation and the attempted murder of Officer Toma. The jury was unable to reach a verdict on the charges of carjacking,

7

sexual penetration by foreign object, and the attempted murder of Officer Montoya; those counts were subsequently dismissed in the interest of justice.

Probation was denied. Samos was sentenced to life imprisonment for the kidnapping for carjacking conviction. He received a sentence of 41 years for the remaining convictions and 25 years to life for the gun enhancement.

**DISCUSSION**

## 1. Sufficiency of the Evidence

Samos challenges the sufficiency of the evidence in support of his conviction for kidnapping for carjacking, a crime that occurs when the defendant "during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person . . ."; in addition, "the victim is moved a substantial distance from the vicinity of the carjacking, and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself." (Pen. Code, § 209.5.) The criminalization of carjacking protects people in a vulnerable situation, because being confronted by a carjacker raises a serious potential of harm. (*People v. Coleman* (2007) 146 Cal.App.4th 1363, 1365, 1368-1369.)

The carjacker's intent to commit the crime may be inferred if the victim was transported to effect the perpetrator's escape "'or to remove the victim to another place where he might less easily sound an alarm.'" (*People v. Perez* (2000) 84 Cal.App.4th 856, 860-861.) The specific intent is found "when the victim remains in the car and the defendant exercises dominion and control over the car by force or fear." (*People v. Gray* (1998) 66 Cal.App.4th 973, 985.)

Tasha was stopped at an intersection when Samos suddenly attacked her by opening the car door and striking her so hard that she was knocked over. Capitalizing on his victim's dazed vulnerability, Samos took the wheel and drove Tasha to the back of a store that was closed for the holiday: she was unable to sound an alarm because no one could see or hear her in that secluded place. The children were left in the car while Samos took Tasha into the store and restrained her with tape and shoelaces. He struck her repeatedly with a gun, inflicting visible injuries, and sexually molested her.

8

After Tasha used a ruse to convince Samos that she would resume her relationship with him, Samos returned to the car with Tasha and drove her to the Arco station, where she managed to escape.  He fled in the victim's car, with the two young girls in the back seat.  During the kidnapping, Samos exerted dominion and control over the car and its driver through force (physical violence) and fear (brandishing a firearm).

Though Samos claims a lack of evidence of his intent to commit a kidnapping in order to facilitate the carjacking, the evidence amply supports the conviction.  The jury could reasonably infer that when Samos attacked Tasha in the middle of an intersection, in full view of passersby, he intended to use her car to drive to a secluded place, restrain her to prevent her from calling the police or running for help, then carried out a pistol-whipping and sexual assault.  The kidnapping and carjacking from a public intersection to the deserted parking lot greatly increased the risk of harm to Tasha and the two children.  The kidnapping continued after the sexual assault, and Samos maintained possession of Tasha's car—with the children in it—even after Tasha escaped, showing that he intended to (1) steal the car and (2) kidnap the occupants.  Though Samos had multiple purposes (such as committing the sexual assault), he committed the charged offense because there was "*an* intent that the kidnapping facilitate a carjacking, even if there are other concurrent intents for the kidnapping." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1365-1366 [defendants properly convicted of kidnapping for carjacking, though their criminal purpose was to force the victims to repay a drug debt].)

**2. Jury Instructions**

  a. *Use of CALJIC No. 9.55*

The jury was instructed with CALJIC No. 9.55:  "Where a person is charged with the crime of kidnapping for the purpose of carjacking, it is not necessary to establish that this purpose was accomplished.  The crime is complete if the kidnapping is done for that purpose."  Samos did not object to the instruction at trial; therefore, he forfeited the right to object on appeal, unless he can show that the instruction "resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more

9

favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Samos has not shown a miscarriage of justice. Neither a completed carjacking nor a completed kidnapping is necessary for an attempted kidnapping during a carjacking. (*People v. Medina* (2007) 41 Cal.4th 685, 690, 694-695.) In this instance, Samos completed the carjacking and the kidnapping: he struck Tasha R., took possession of her car, drove the car some distance, assaulted the victim, drove the car to an Arco station, then drove the car away from the Arco station with two children in the back seat. The car was not recovered until the following day. Samos is unlikely to have obtained a more favorable result in the absence of CALJIC No. 9.55. The jury properly applied CALJIC No. 9.54.1, the kidnapping during a carjacking instruction, which requires the taking of a motor vehicle in the possession of another.

b. *Failure to Instruct on Kidnapping*

Samos contends that the court should have instructed the jury, sua sponte, on the crime of kidnapping. Kidnapping is a lesser included offense to the charge of kidnapping for carjacking. (*People v. Medina, supra,* 41 Cal.4th at p. 701.) "The court has a duty to instruct sua sponte on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but has no duty when there is no evidence that the offense was less than that charged." (*People v. Lewis* (1990) 50 Cal.3d 262, 276; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 368.)

If the intent to rob the victim of his or her car "is formed after the victim is seized, the offense . . . is simple kidnapping and not kidnapping for the purpose of robbery." (*People v. Bailey* (1974) 38 Cal.App.3d 693, 699.) By comparison, when a defendant jumps into a vehicle, knowing that a family is inside of it, and successfully drives away, he has simultaneously committed a carjacking and a kidnapping. (*People v. Medina, supra,* 41 Cal.4th at p. 700.) In *People v. Ortiz*, for example, the defendants jumped from their car and into the victims' BMW, driving away with the victims inside. "There can be no doubt the kidnappings occurred *during* a carjacking. The kidnappings did not occur before the carjacking, but rather were simultaneous with and during the carjacking."

10

(*People v. Ortiz, supra,* 208 Cal.App.4th at p. 1368.)  Under those circumstances, there was no need to instruct on simple kidnapping.  (*Ibid.*)

There is no substantial evidence in this case that Samos formed the intent to steal Tasha's car *after* seizing her as a kidnapping victim.  This is not a scenario in which he kidnapped Tasha at a public park, then impulsively formed the intent to force her from the park and into her car to travel to another locale.  There was no simple kidnapping.

The kidnapping and the carjacking occurred simultaneously in this case.  Tasha was in her car on a public street when Samos attacked her.  Samos had to form the intent to overpower her, striking her and knocking her over to take control of her vehicle and drive it away out of the intersection and down the street (the carjacking), using the vehicle to transport her and the children to a secluded location away from public view (the kidnapping).  A kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and reaches a place of temporary safety.  (*People v. Palacios* (2007) 41 Cal.4th 720, 726.)

Samos maintained possession of the carjacked vehicle and the children inside of it even after Tasha jumped from the car and escaped when Samos stopped at the Arco station.  He subsequently used the car to chase Tejada, and later drove it to Long Beach to retrieve his sons.  There is no credible evidence that Tasha willingly and voluntarily gave Samos possession of her car:  the severe injuries to Tasha's face (including a black eye and cut lip) and the bruises on her body support her testimony that Samos battered her in order to overpower her and complete his crimes.  The crime posed a significant risk to Tasha, the children, and the general public.

There is no evidence that Samos's crime was anything less than a completed kidnapping while carjacking.  Because Samos's defense was complete denial of culpability—he denied attacking Tasha in her car at an intersection and kidnapping her— the trial court was not required to instruct on lesser included offenses.  The crime was the one charged or (if the jury had believed Samos's testimony) it was no crime at all but a consensual meeting between lovers for a tryst at an appliance store.  (See *People v. Moye* (2009) 47 Cal.4th 537, 548 [no evidence that the crime was less than that charged].)

11

### 3. *Pitchess* **Motion**

Samos filed a pre-trial motion to discover the records of Officers Toma and Montoya from the LAPD. The People opposed the motion, arguing that police personnel records are privileged and Samos failed to show good cause to produce them. At a hearing on September 8, 2010, Samos maintained that he fired his gun at the officers in self-defense; therefore, he had to discover whether officer misconduct was detailed in LAPD records. The court scheduled an in camera review of Montoya's records to determine whether he had a history of excessive force.

On October 15, 2010, the People disclosed the existence of an investigation by LAPD into the shooting in this case, and stated in open court that Samos's attorney was receiving some 2,000 pages of discovery that day. There is no indication that the defense ever objected to the adequacy of the records it received from the LAPD. Nor is there any indication that the court conducted an in camera hearing after the prosecution volunteered to tender the LAPD records to the defense. There is nothing to review on appeal because the *Pitchess* motion became moot when Samos's attorney received the LAPD records, then registered no subsequent objection to the adequacy of those records.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.          FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12